Will the clerk please call the next case? 5-16-0240, Wal-Mart Stores v. Workers' Compensation Comm'n Counseling, you may proceed. Hi, please, clerk, counsel. My name's Roby Jeberonic. I'm here on behalf of the employer, Wal-Mart. By way of history, the arbitrator entered an award that was favorable to Wal-Mart following a 19-B hearing on June 21, 2011, or that was the date that the decision was made, finding that Mr. Carlisle did not prove that his current condition of well-being was causally related to the work accidents of either March 4, 2005, or December 8, 2006. Counsel, I hate to interrupt this, but it occurs that we have a substantial issue-slash-problem with the record. Maybe you can illuminate something for us. According to the appendix to the Respondent's Brief, the record in this case consists of six volumes composing more than 1,200 pages. The record on appeal filed in this case is just three volumes and less than 300 pages. How is that? I would have to look that over, Judge. You may want to look that over because- I did see there was something I thought missing in the appendix when I was reviewing this. Well, there's a lot missing. Let me call your attention. The record does not-this is my review. I don't know if my colleagues saw something different. The record does not include any evidence taken at the arbitration hearing, including the claimant's testimony or any of the medical records. Do we have that? Why don't you take a moment and tell us. If it's not in the brief and it was not supported- There's a problem, isn't there? Can you tell us, when you look at your statement of facts, the citations to the record, are you citing to actual testimony or are you citing to a decision by the arbitrator or the commission, such as citations to doctor's testimony, doctor's findings and so forth? It might give us some clues as to whether or not- You're citing to the record, I believe, Your Honor. You're citing to the actual testimony of the physicians? Right. But you don't know, as you stand there, why all these volumes are missing? There were direct cites to the record and to the testimony that was given. And both parties actually entered in a statement of facts. But wouldn't you normally think it important to include the claimant's testimony- Certainly. Medical records and the evidence at the arbitration hearing? I cannot answer the reason why that is not included at this moment. Have you heard of the case of Fouch? I have not, Your Honor. Okay. I'll just- Fouch basically says, in the absence of a complete record, it will be presumed that the order entered by the trial court was in conformity with the law and had a sufficient factual basis. And actually, if you look at this Ferris case, we recently extended that concept to decisions rendered by the commission. Just keep that in mind as you give us your argument. But anyway, go on with your argument. I don't want to throw you off your stride. I was hoping you could tell us where the missing record was. It could be back in our office. I mean, it certainly doesn't do well right now unless I can make a verbal motion to supplement the record. With what? You don't know what's missing, if anything's missing at this point. So an oral motion to supplement is nonspecific at this point. Well, at least with the petitioner's testimony. So you could see the record in itself. I know counsel has some stuff in here. At least to add a decision opinion on the matter. I'm just going to shoot him from the hip on this one as far as the best I can do. But if that is what you feel is critical in this thing, I would. A motion will be taken and revised. At this point, we will want to hear from the opposing counsel on the matter. Continue on with your argument. Okay, I'm sorry. And then the commission did affirm the arbitrator's decision of February 2012. Mr. Carlisle appealed that to the commission's decision to the Circuit Court of Madison County, where the findings and conclusions made by the commission were reversed and remanded back to the commission per the order of November 3, 2012. The commission then issued a decision and opinion on remand on October 3, 2014, albeit begrudgingly, pursuant to the directive of the Circuit Court. That decision and opinion on remand was appealed to the Circuit Court of Madison County, and to no surprise, it was upheld and per the order dated May 3, 2016. The employer requests this honorable court determine whether or not the original decision dated February 8, 2012 and the findings noted therein by the commission, including but not limited to that Mr. Carlisle failed to prove his current condition of well-being was causally related to the work accidents of March 4, 2005 or December 8, 2006, were against the manifest weight of the evidence, which is the applicable standard of review here. And in reviewing the commission's original decision of February 8, 2012, the review in court will assess whether or not there's sufficient factual evidence in the record to support the decision or whether the finding is against the manifest weight of the evidence and an opposite conclusion is clearly apparent. I believe it's well known that when a party appeals to this honorable court in a workers' compensation proceeding, it is the decision of the commission and not the judgment of the circuit court that is under consideration. And further, when the circuit court reverses the commission's initial decision and the commission enters a new decision on remand, it's then this honorable court must decide whether or not the commission's initial decision was proper. That is correct. And it's the function of the commission alone to determine and weigh the evidence, including but not limited to competing medical opinions, determining the credibility of witnesses, and drawing inferences from that evidence. We hold that the original decision was based on substantial factual evidence, including but not limited to medical testimony, records, and the credibility of the witnesses. But if we don't have that testimony, we are a little hampered, would you admit, in our review? Because what you're saying requires us to look at the evidence, look at the testimony. And when looking at testimony, there are the decisions of the arbitrator, the commission, and... You know, I'm looking at the appendix, and it indicates that the claimant's testimony, it says witness testimony, and I'm assuming that's his arbitration hearing testimony, that it begins at the record at page 1042. And in your statement of facts, you are quoting and citing testimony in that portion of the record. So it looks like in your statement of facts, you are citing to the record, and it would seem that when you prepared your brief, you would have had that portion of the record for review. So I don't know, it's somewhat of a mystery. Absolutely, and I think it was, and there was actual other quotations that was taken straight from the testimony that was heard by Mr. Carlisle. And I, looking at the evidence, even at what the commission based their decision on, and what they put in their decision, and the fact that they concluded by itself would carry the day that this decision was not against the manifest way of evidence. There was certain testimony elicited from Mr. Carlisle, which clearly indicated that it was inconsistent. They did not find him to be credible. As far as the testimony by the doctors and the difference in the medical opinions, they were based on a history provided by Mr. Carlisle, who was ultimately found not to be credible by the commission. The circuit court, when they were looking at, I mean, clearly, I know you stated it earlier, I think it's clear that they substituted their judgment for it. And it's clearly said, and I think paragraph one is the commission determines the credibility of the witness, unless an opposite conclusion must be drawn. And they list a whole host of reasons that appears to be that they're weighing the facts and substituting their judgment. And then when we look back at the initial commission decision, they lay out several facts, which are sufficient basis for their opinions that they drew, finding that his condition, Mr. Carlisle's condition, was not causally related to either one of those accidents, based upon the facts that were presented of him, the treatment that he had, and then his deployment to Afghanistan. And the intervening accident when he was lifting a tire on February 23, 2009, sought medical treatment immediately thereafter. And there was a witness that cooperated with that, that was with him that day, that said it was a very heavy tire, there's two of them that needed to lift the tire. And they discussed lifting techniques. He sought immediate treatment thereafter. He testifies that arbitration, you know, and in the doctor's records, and I think it's undisputed that he has said, you know, my pain hasn't changed from before and after deployment. But clearly that cannot be the case, because he would have never got deployed. He would have never been able to walk the miles with the packs. And not to mention, after this guy's accident, he worked for five employers. He went to work for Walmart, he quit that after giving 30-day notice. He went to work for the VA, which he had worked for on a part-time basis before, taking on a full-time job. So he knows, I mean, he worked there in part-time, he sees what's going on, knows what it is. Says he can't work there any longer because of his pain. Then goes to work at McDonald's. Works there, says he had to quit because of his pain. Then he goes to work for McBurger King. I don't know what the difference is between, you know, his job duties, but I assume that there weren't much of any. Quits that. Not to mention, he's in the National Guard. You know, he's got to go do guard duties and whatever that entails, and he was capable of doing that. Clearly, if he was in excruciating pain, I don't think they would have him be doing guard duty. I don't even think he would have been a candidate in any of his superior's eyes to be deployable at all, if he really had this pain that he claims he had. When you do look at the record from what you do have underneath you at this time, I apologize for that, using the commission's original decision by itself should contain enough sufficient evidence by the arbitrator and the findings of facts that he made, which the commission adopted entirely, and that by itself should be enough to make a finding that their decision was not against the manifest way of evidence. Okay, very good. Thank you, counsel. We have time for a response. Counsel, you may respond. Well, as it relates to the motion to supplement, while I... You are, for the record, in it. My apologies. My apologies to the court. May it please the court, my name is David Jerome, and I'm representing Jason Carlisle in this matter today. And counsel, for the motion to supplement, while I hate doing this, I would have to oppose it on behalf of my client and would ask that the final decision on remand be affirmed as presented. Counsel, may I ask you, just in terms of your review of the record or your citation to the record, did you cite to any portions of the claimant's testimony or the medical testimony that was presented at arbitration? I see references, for instance, to the record that, according to a claimant's appendix, would appear to correlate with claimant's testimony at arbitration. So can you represent to the court what you were looking at when you made reference to, for instance, the record at pages 1071 to 1072, which I'll suggest to you, according to the appendix to the appellant's brief, is the direct examination of claimant. We were using... I was citing to the actual transcript, formal transcript that we would have gotten that had bounced around from the commission to circuit court, back to the commission, back to the circuit court, and then should have been filed with... Why isn't it part of the record? That is the part that, whenever we had cited to it, we had returned it to the appellate court. We had checked it out as part of this and returned it to the appellate court. That is our normal method. But you're representing to the court, you had the official record, the certified record, in front of you as you were preparing the appellee's brief. Yes. Yes, I did. And that is something that I... And that's why I don't know, because we know that we would have had to check it out from the appellate court, because there are some extra pages, some legal pages that are numbered by the appellate court, that we would have had to reference as well within our brief. So, if it is simply something that had been administratively misplaced, then obviously I would withdraw my objection. So, it's not... I just don't know where it went, to be quite honest. Well, we don't know either. I don't think we can start making decisions that it was administratively, as you say, misplaced. We don't know what happened to it. Right. So, shall I continue with my argument? Yes, please. All right. As you've heard, there are two decisions that we want to talk about. One would be Commission Decision 1 and Commission Decision 2. As you saw, even with the dissent on Commission Decision 1, we believe that it's against the manifest weight, because regardless of the weight of the testimony, there's absolutely no medical opinions talking about a subsequent intervening event. All three of the doctors, both treating doctors as well as respondent of the employer's own independent medical examiner, all said that the injury to the back, mainly the sangular tear, had predated his deployment to Afghanistan. And so, in this situation, what we believe is Decision 1 is against the manifest weight. Decision 2, after it was remanded, is now in accordance with the evidence and is not against the manifest weight. What are we reviewing, Decision 1 or 2? Decision 1. All right. So, whenever I get to the end, I will be asking that Decision 2 be the one that would be affirmed, since it's the one that goes through the discussions. Also, as was seen in the previous argument, the circuit court, in this situation, Judge Prowder, during her reversal of this, went out of her way to say, I am not re-weighing the testimony of the employee, nor am I really weighing the medical evidence. What I'm saying is, as I look at the medical evidence, there is no evidence to support this conclusion that there's a subsequent intervening event. Now, as you've heard today, one of the things that's been discussed is credibility of Jason. And Jason's credibility is limited, because they're not saying that he lied about the accident. They acknowledged there was an accident. They're not saying medical causation, because really, that's not his. That's the doctor's. And all three agree that the accident either caused the annular tear, or the annular tear was there before and it aggravated it and made it symptomatic, leading to the need for treatment, including the surgery. All three doctors are in agreement with that. The question is whether one form that he completed on deployment, and more importantly, one box of one form that he completed on deployment, where he checked he was in excellent health, whether that overrides and negates all of the medical testimony that said this condition was there beforehand. Now, for us, the timeline becomes very important. As you've heard, the accidents are undisputed. March 5th, 4th, 2005, December 8th, 2006, he injures his low back. Injuries were compensable. Medical benefits were provided. He had to stop his work at Walmart, because when he would try to load his back, he would develop symptoms. He tried working in various locations. You heard of all the different places that he tried to work at,  lifting, doing anything of that nature, it would cause the symptoms to come back. By October of 2007, that's when Dr. Van Ryan says, I think you've got an annular tear. I want a discogram to confirm this for surgical basis. October of 2007 is long before he was deployed. It becomes important because Walmart refused the testing. They had no opinion, countering it, but they refused the opinion. That's when he was given his deployment. He was told, in nine months, you're going to be deployed. You're going to go to Afghanistan. So what did he do? He started losing weight. He couldn't exercise, so he was almost starving himself, but he lost 60 pounds. Why? Because, as he said, I'm not going to leave, or let my guys leave, without me being involved with this. This is part of what's called unit integrity. So whenever he fills out that paperwork to be deployed, he checks the box saying, I'm in excellent health. Why? Because he knows if he checks otherwise, he's not going. The nurse that the respondent had testified, he even said, that's pretty common. National Guardsmen do it all the time. They minimize their injuries because they want to be deployed. Ironically, Dr. Van Ryan, the guy who already had diagnosed the annular tear, he said, I see it all the time. I'm a colonel. This is what I do at these medical evaluations. It's called unit integrity. He doesn't want to be left behind, and so he checks the box that says excellent health. So he goes to Afghanistan. While in Afghanistan, he lifts the tire. When he lifts the tire, he has back pain. As he describes it, it's the same back pain that I had when I worked at Burger King, McDonald's, all the other locations. When I load my back, it hurts. He comes back home. He sees Dr. Van Ryan, and this to me is the most important. Dr. Van Ryan says, your physical examination is the same. The location and the level of your symptoms are exactly the same. There's no intervening event. Dr. Lee, the surgeon, says the same thing. There's no intervening accident. This is just the continuation of this annular tear. And the most important part is when they send him over to Dr. DeGrange, respondent section 12 examiner, Dr. DeGrange says he had an annular tear before this work injury. He was provided the history of lifting the tire, and Dr. DeGrange said it didn't cause a new injury. So there's no medical supporting a new accident. Yet he's being demonized because he checked one box. I think you kind of mistake that. It's not whether there is a new accident. We know there's a new accident. He's in Afghanistan lifting the tire. But the question is, this positive question, is whether that accident has, breaks this chain. You're right. I meant the word intervening accident. You're right. My apologies. And no doctor said there was a, quote, intervening accident as identified under the Ward Comp Act. And so there's nothing here that's breaking the causal chain. So that's where we stand on all this. So where did the commission come up with their conclusion? Where did they get their evidence? They based it upon a hypothetical given to Dr. Van Ryn and Dr. Lee. They were asked, both doctors in deposition were asked to assume Jason had no low back symptoms when he was deployed, normal examination prior to deployment. When he lifted the tire, he had increased low back pain to the point of needing medical attention. Both of the doctors said, well, yeah, that's an aggravation. But it's not an intervening accident. It's just an aggravation because both of the doctors then spent the next hour and a half of the deposition saying, he didn't, he wasn't symptom free. And, in fact, the month before, he was seen at the VA before he checked that box saying he was in excellent health. He was seen in the VA saying, I'm having low back problems. So the low back symptoms are already noted in the VA records as being ongoing. So both doctors said he had ongoing symptoms. We know he didn't have a normal physical examination. Why do we know? Dr. Van Ryn is the one that said he has the annular tear long before he was deployed. You can't have a surgical state become more surgical. And that's why Dr. Van Ryn said, if the physical examination findings and the symptoms are the same both before and after deployment, I don't see a new accident. It's just a continuation of the same event. And when he had those symptoms, it's what we expected. That's what mechanical low back pain emanating from an annular tear is going to develop. So that's where Dr. Lee and Dr. Van Ryn, in the hypothetical, they said it aggravated it. That's what the commission latches on to in saying, look, there's a subsequent intervening event. But it's a hypothetical that's incomplete, and it's also a hypothetical that both doctors said, that's not what I'm saying. If you're giving me this, no low back symptoms, his examination was normal, okay, that aggravated. But given the fact that he had low back symptoms and an abnormal physical examination, this is just a continuation of what I saw in October 2007, long before he was deployed. That's what Judge Crowder, that's why she reversed this, not based on weight of the evidence, but based on the fact that all of the medical experts were saying there's no intervening accident. All of them are saying this is just a continuation, including respondent's own doctor, Dr. DeGrange. So that's why we're asking that the remand order from the commission be affirmed, that Commission 2, not Commission 1, because Commission 1 has absolutely no medical basis for its conclusions. Now in remand order 2, Commission 2, it lays out the benefits to be provided and everything like that, so it makes it easy. We don't have to send it back. We already have the order that if affirmed, it tells us what needs to be done next. So in this situation, we're asking Commission 2 be affirmed, and that it be remanded to the commission for further treatment. Thank you. Thank you, counsel. Counsel, you may reply. I want to address a few things. Prior to his deployment, there was an MRI taken, and there wasn't an annual or tear diagnosed. It was a bulge. There was no finding of impingement. Mr. Carlisle had undergone physical exams that did not show any radiation or radicular pain or straight leg. There was no positive straight leg test. It was essentially negative other than his complaints. He had severe complaints at that time. There was no surgical recommendation made, and it wasn't until he returned from deployment and after there was documented history that he was lifting a tire and sought medical treatment afterwards at the VA. I know Mr. Jerome speaks about this gentleman treating up to the time of deployment. Yeah, sort of true. He went and was seen, but then there was at least a month gap beforehand where he says, I am excellent health. I'm ready to roll. And then when he goes through Fort Bragg and he does his training, he's carrying backpacks. They're training for deployment. They're setting up camps. They're doing a lot of things. And if this guy was in excruciating pain like he wanted to lead everybody to believe, I don't think his troops, his fellow troops would go in there with him because he might be a danger to their actual troop. But in the hypothetical that was given, the reason why it's so important is because Mr. Carlisle never told his doctors about the aggravating incident that occurred in Afghanistan and the incident with being the tire. And they admitted that, you know, should he have been asymptomatic at the time of deployment? He goes to deployment, has an accident, lifting a tire, increasing pain and seeks treatment. That is an intervening accident. That's an intervening accident, aggravation. There is a change in his condition. This guy, I don't think there's a surgeon out there. I hope not, that would treat on somebody that's asymptomatic. This guy might have had an annual tear disc bulge predating, well predating any of these accidents that may have been symptomatic on March, the first date of accident in March 2000. Well, the first date of accident, I mean, and then came back to baseline because he was just lifting, if you remember the first accident, I think everybody, there's no dispute, he was lifting a 24-pack of water, went off work, had increased pain, not much treatment and back to work. And the point being is if somebody's symptomatic, regardless of what the pre-existing findings are, if there's no problem to treat them, they're not going to do a back surgery for this gentleman. It wasn't until he returned following deployment, there is evidence of an intervening accident wherein he sought treatment, and there's evidence that he was asymptomatic prior to his deployment. For those reasons alone, I think there's no issue that the commission's original decision of February 8, 2012 was not against the weight of the evidence. Thank you. Thank you, counsel. Thank you, counsel, both for your arguments in this matter. We'll be taking our advisement at this position shall issue. The court will stand in recess until 1.30 this afternoon.